IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EDMUND D. HEFFERNAN, II, ET AL. | : | |
| | : | |
| v. | : | CIVIL NO. CCB-06-966 |
| | : | |
| LUMBERMENS MUTUAL CASUALTY CO. | : | |

...o0o...

**MEMORANDUM**

Lumbermens Mutual Casualty Company ("defendant" or "Lumbermens") has moved for summary judgment, claiming that the auto insurance policy it provided to Reckitt Benckiser Corporation ("corporation"), the employer of Edmund D. Heffernan, II ("plaintiff" or "Mr. Heffernan"), does not include coverage for the car accident which killed the daughter of Mr. Heffernan and Dianne S. Heffernan ("plaintiffs" or "the Heffernans"). The plaintiffs have filed a motion requesting an extension of time for discovery before responding to the summary judgment motion. The motion for an extension of time has been fully briefed, and pursuant to Local Rule 105.6, no hearing is necessary. For the reasons set out below, the defendant's motion will be denied without prejudice and with permission to re-file if appropriate; the plaintiffs' motion will be granted, and limited discovery will be ordered.

**BACKGROUND**

In April 2003, 17-year-old Mallory Heffernan was seriously injured when the driver of the car she was in, John McMahon, Jr., lost control and hit a truck while driving in Delaware. (Compl. ¶¶ 4, 14, 16.) Ms. Heffernan survived the crash but died shortly afterwards. (*Id.* at ¶

1

16.)  The car in which she was riding belonged to a member of the McMahon family.[1] (Lumbermens' Mot. Summ. J. ¶ 3.)  Mr. Heffernan appears to have had the use of one of the corporation's cars in connection with his employment as a sales director stationed in New Jersey (Lumbermens' Mem. P. & A. Supp. Mot. Summ. J. [hereinafter "Lumbermens' Summ. J. Mem."] ¶ 3), but this car was not involved in the accident (*id.* at ¶ 4).

The Heffernans first sued to obtain coverage for the accident from their personal insurance provider, Erie Insurance Exchange ("Erie"); that suit is also before the court (CCB-05-1888).  The Heffernans next sued Lumbermens,[2] claiming that the policy Lumbermens had issued to the corporation applied to them and/or their daughter, and specifically provided uninsured or underinsured motorist coverage (collectively "UIM") applicable to the accident which killed Ms. Heffernan because Mr. McMahon was an uninsured or underinsured driver.[3] (Compl. ¶¶ 8-9.)  Lumbermens moved for summary judgment, arguing that the policy was unambiguously limited to cars owned by the corporation, thus no coverage exists because the car involved in the accident did not belong to the corporation.  (*See* Lumbermens' Summ. J. Mem. at

---

[1] The car has alternately been identified as belonging to Mr. McMahon himself (Lumbermens' Mot. Summ. J. ¶ 3), as well as to his mother (Certification Order at 2) (note that this order was issued in another case, *Heffernan*, *et al. v. Erie Insurance Exchange* (CCB-05-1888) based on the same underlying facts).  For purposes of the present motion, however, it is sufficient to have established that the car was not owned by a member of the Heffernan family or by the corporation.

[2] This suit is properly before the court on diversity grounds.  (*See* Compl. ¶ c.)

[3] It appears likely that Mr. McMahon was an underinsured driver, as he was determined to have this status in the *Erie* case (Certification Order at 4), and Lumbermens claims that the plaintiffs have received some insurance payments already, presumably through Mr. McMahon's policy (Lumbermens' Opp'n Pl.'s [sic] Mot. Extend Time [hereinafter "Opp'n Mot. Extend"] at 1, n.1).  It is thus not inaccurate to refer to him as an underinsured driver, as the defendant does, however, his status has not been definitively established in the case before the court.

8-14.) The Heffernans have responded to the summary judgment motion by seeking time for discovery, and they have supported this request with an affidavit identifying specific questions they would ask a Lumbermens' representative in a deposition. (Mot. Extend Time to Respond Def. Lumbermans [sic] Mot. Summ. J. [hereinafter "Mot. Extend"] ¶ 4.)

### ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club*, *Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). A request for time for discovery under Fed. R. Civ. P. 56(f) is appropriate when the party opposing summary judgment is not yet in possession of such facts but has a legitimate basis for believing they might exist. *See generally* 10B Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2740 (3d ed. 1998).

3

A Rule 56(f) request should be granted when the party opposing summary judgment "has not had the opportunity to discover information that is essential to his opposition." *Anderson*, 477 U.S. at 250, n.5.  Such a request must be supported by "an affidavit . . . that particularly specifies legitimate needs for further discovery." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995).  A convincing Rule 56(f) affidavit contains specific and detailed information about the proposed discovery that links it to the elements necessary for an effective opposition.  *See*, *e.g.*, *Fairclough v. Board of County Comm'rs of St. Mary's County, Md.*, 244 F. Supp. 2d 581, 586 (D. Md. 2003) (granting time for discovery based upon affidavit identifying specific items essential to non-movant's ability to oppose summary judgment).

At this time, it has not been established which state's law applies and thus what substantive legal standards will govern this case.  Neither party has identified a forum selection or choice of law clause in the insurance policy; indeed, the defendant states that it is not sure whether Maryland, New Jersey, or Delaware law applies (Lumbermens' Opp'n Pl.'s [sic] Mot. Extend Time [hereinafter "Opp'n Mot. Extend"] at 2, n.2) and presumably, if such a clause existed, the defendant would have brought it to the court's attention.  An initial review of the relevant case law suggests that New Jersey law would likely apply.  The court must apply Maryland's choice of law principles to a diversity suit, and "[i]n insurance contract cases, Maryland courts generally follow the rule of *lex locus contractu*, which requires that the construction and validity of a contract be determined by the law of the state where the contract is made." *Roy v. Northwestern Nat'l Life Ins. Co.*, 974 F. Supp. 508, 512 (D. Md. 1997), *aff'd*, 141 F.3d 1159 (4th Cir. 1998) (internal citations omitted; italics in the original).  A contract is considered "made" in the place "where the last act necessary to make the contract binding

4

occurs," which is generally the site of the policy's delivery and payment of the premiums. *Id.* (internal citations omitted). As the insured corporation seems to be based in New Jersey (*see* "Common Policy Declarations"[4] (form IL 7901)) (listing New Jersey address for the corporation), it seems likely that both delivery and payment occurred there, making New Jersey law applicable.

This issue does not have to be resolved for purposes of the present motions, however, as the plaintiffs' affidavit identifies policy ambiguities which not only support the need for discovery but preclude the court from deciding the terms of the insurance contract as a matter of the law of any state at this time. As a general rule, "[i]f the policy terms are clear, courts should interpret the policy as written and avoid writing a better insurance policy than the one purchased." *President v. Jenkins*, 853 A.2d 247, 254, 180 N.J. 550, 563 (N.J. 2004) (internal citations omitted).[5] If the policy or its terms are ambiguous, however, the court may turn to other sources to assist with interpretation, such as extrinsic evidence, *see American Cas. Co. v. Continisio*, 819 F. Supp. 385, 397 (D.N.J. 1993), *aff'd*, 17 F.3d 62 (3d Cir. 1994) (considering extrinsic evidence in interpreting insurance policies is allowed under New Jersey law), or principles of construction, *see President*, 853 A.2d at 254 (construing ambiguities against the insurer is often appropriate).

The method of resolving ambiguities may vary between states. For instance, Maryland

---

[4] All insurance documents referenced were submitted as Exhibit D to Lumbermens' motion for summary judgment. Subsequent citations to any insurance documents will omit this reference.

[5] This opinion will cite to New Jersey law for general principles of contract interpretation, but this should not be construed as a decision regarding the choice of law issue.

and New Jersey seem to have somewhat different approaches regarding at what point in the interpretation process and to what extent a policy will be construed against the insurer. *Compare Cheney v. Bell Nat'l Life Ins. Co.*, 556 A.2d 1135, 1138, 315 Md. 761, 767-68 (Ct. App. 1989) (explaining that "Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer," but if ambiguities remain after considering additional evidence or if no such evidence is offered, then the policy "will be construed against the insurer as the drafter of the instrument") (internal references omitted) *with Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260, 128 N.J. 165, 175 (N.J. 1992) (explaining that "courts must assume a particularly vigilant role in ensuring their [insurance policies'] conformity to public policy and principles of fairness . . . [an] ambiguity is resolved in favor of the insured, and in line with an insured's objectively-reasonable expectations") (internal references omitted).[6]

Although the plaintiffs filed their affidavit in support of a motion for time for discovery rather than as an opposition to the defendant's summary judgment motion, it serves both functions. The affidavit identifies parts of the policy which are ambiguous. (*See* Aff. of Samuel H. Paavola, Counsel for Pl. [sic], and Edmund D. Heffernan, II [hereinafter "Aff."] at ¶¶ 4 C, E, F, G, H) (focusing on ambiguities regarding terms and scope of coverage of the three "Drive Other Car Coverage" endorsements attached to the main policy declarations). These ambiguities, which involve parts of the insurance contract that seem to have potential for providing coverage to the plaintiffs, prevent the court from determining coverage as a matter of

---

[6] If either party moves for summary judgment in the future, the choice of law issue should be briefed.

law based only on the policy, thereby serving as a basis for opposing summary judgment as well as warranting time for discovery.

Lumbermens opposes the request for time for discovery, arguing that the "policy expressly and unambiguously limits UIM [defined as here as underinsured motorist coverage only] to autos owned by Reckitt Benckiser." (Opp'n Mot. Extend at 1-2.) It seems clear that the main provisions of the policy (no. F5D 008 448-00),[7] as set forth in the "Business Automobile Coverage Part Declarations" (CA 7200), are limited to vehicles owned by the corporation. (*See* Lumbermens' Summ. J. Mem. at 8.) The "Business Automobile Coverage Part Declarations" (CA 7200) has the number "6" listed in the section for "Covered Autos" for both under and un-insured motorist coverage. The "Business Auto Coverage Form" (CA 0001)[8] sets forth the class of vehicles which "6" signifies: "Only those 'autos' you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorist Coverage." This form also establishes that "you" means "the Named Insured shown in the Declarations." The only "Named Insured" listed in the Declarations section (CA 7200) is Reckitt Benckiser, thus taken together, the Declarations section and the Coverage form make

---

[7] Note that Lumbermens identifies the policy it issued to the corporation as bearing the number "F5D 008 448-00" (Lumbermens' Summ. J. Mem. ¶ 20), however, in the materials it provided with its summary judgment motion, it also included two smaller packets with different policy numbers, "F5D 008 449-00 (Virginia Declarations)" and "F5D 008 450-00 (Business Automobile Coverage Form Declarations)". The latter is not identified on the cover page as relating to any particular state, but the attached pages suggest that it refers to Texas. All references to insurance materials or provisions will be to the larger main packet (policy no. F5D 008 448-00) unless otherwise indicated.

[8] There are multiple editions of this form, some of which seem to refer to different states, according to the table of contents listed on the "Business Auto Policy (continued)" (form CA 7250), but they are all identical in their definition of the vehicles signified by the number "6".

7

clear that the under and un-insured motorist coverage set forth in the Declarations section is limited to those cars owned by Reckitt Benckiser that are required by law to have such coverage. As it is undisputed that the car in which Ms. Heffernan was riding at the time of the accident was not owned by Reckitt Benckiser, it was not covered by the insurance terms set out in the Declarations section (CA 7200). Lumbermens is thus correct that the main provisions of the policy do not provide coverage for the accident which killed Ms. Heffernan.

The plaintiffs, however, seek to rely upon additional coverage provided in three endorsements entitled "Drive Other Car Coverage– Broadened Coverage for Named Individuals" (form CA 9910; three editions, 01/87, 12/93, 07/97). (*See* Aff. at ¶¶ 2-4.) These three endorsements– each of which is conspicuously marked "[t]his endorsement changes the policy"– extend coverage beyond that set out in the Declarations section (CA 7200) to "[a]ll executive officers or other employees assigned a company car". The first endorsement ('87 edition) has included uninsured motorist coverage in the premium paid by the corporation, indicating that Reckitt Benckiser is paying for extra protection for certain individuals. The second page of this first endorsement states that for the purposes of this additional uninsured motorist coverage,[9] the definition of "insured" is extended to:

> Any individual named in the Schedule [executive officers and company car users] and his or her "family members". . . while "occupying" or while a pedestrian when being struck by any "auto" you don't own except: Any "auto" owned by that individual or by any "family member".

A "family member" is then defined as "a person related to the individual named in the Schedule

---

[9] Note that the definition of "family members" is not specifically characterized as applying to underinsured motorist coverage under this endorsement, creating a potential issue if Mr. McMahon is eventually confirmed to have been an underinsured rather than an uninsured driver.

[executive officers and company car users] by blood . . . who is a resident of the individual's household."

If this endorsement applies to Mr. Heffernan, it supports his argument that coverage exists for the accident which killed his daughter. It seems that Mr. Heffernan had the use of a company car (Lumbermens' Summ. J. Mem. ¶ 3); he is thus an individual named in the schedule, which means that Ms. Heffernan, as a family member,[10] also is afforded coverage under this endorsement. The accident which led to her death occurred as she was occupying[11] a car that neither she nor any of her family members owned. If Mr. McMahon were found to be an uninsured or possibly an underinsured driver, then the plaintiffs would have a strong argument for the existence of coverage under the '87 edition of the endorsement.

There are two main areas of ambiguity, however, that need to be resolved in order to determine the scope of the coverage afforded by the policy as amended by these "Drive Other Car Coverage" (form CA 9910) endorsements. The first is whether the '87 edition of this endorsement applies to Mr. Heffernan. It is clear that he would qualify as an individual named in the schedule; it is not clear what state(s) this endorsement is intended to cover. No states are listed on the face of the first endorsement itself, however, on the page listing the endorsements attached to the policy, "Business Auto Policy (continued)" (form CA 7250), this endorsement (form CA 9910, '87 edition) is said to apply to New York and Puerto Rico.

---

[10] The court will assume that Ms. Heffernan was a resident of her father's household, as she was a minor and no indication has been given that she did not live with her parents.

[11] No argument has been made that Ms. Heffernan was not "occupying" Mr. McMahon's car in the sense that the term is commonly understood– namely, she was a passenger, riding inside of the vehicle at the time of the accident.

The second and third editions of the "Drive Other Car Coverage" (form CA 9910, '93 and '97 editions) do not appear to provide uninsured or under-insured motorist coverage. The second or '93 edition has various states to which it applies listed on its face: Alaska, Arkansas, California, the District of Columbia, Kansas, Maryland, Maine, Minnesota, Montana, New Mexico, South Carolina, and Wisconsin.[12] The list of endorsements on the "Business Auto Policy" page provides a different list: Arkansas, California, Kansas, Louisiana, and Minnesota (notably absent is Maryland). The third or '97 edition has no states listed on its face, nor does the "Business Auto Policy" page list any.

The conflicting information for the first and second endorsements ('87 and '93 editions) creates substantial ambiguity regarding to which states the two different versions of the endorsement– one providing for uninsured and possibly under-insured motorist coverage ('87 edition), the other not providing such coverage ('93 edition)– refer. The references to states in general is also ambiguous, as it is unclear how the individuals listed in the schedules on each endorsement are linked to the various states. For instance, an individual could be associated with the state in which he or she lives, or the state in which his or her job is located, or the state in which his or her company car is registered. With respect to Mr. Heffernan, the first option would link him to Maryland (Compl. ¶ a); the second to New Jersey (Lumbermens' Summ. J. Mem. ¶ 3); and it is unclear where he would be linked under the third option (*see* Aff. ¶ 4F) (seeking to ask Lumbermens' representative where Mr. Heffernan's company car was registered). The mechanism by which individuals come to be associated with a particular state

---

[12] Although the plaintiffs' affidavit questions whether these abbreviations are meant to refer to the states (Aff. ¶ 4H), the court will afford them their ordinary meaning absent any indication to the contrary.

must be established, as must what edition of the endorsement applies to the state with which Mr. Heffernan is found to be associated. If the '87 edition applies to Mr. Heffernan, he has a strong argument for the existence of coverage for his daughter's fatal accident; if the '93 or '97 editions apply instead, it is hard to see how his position could be successful.

The second central ambiguity, assuming that the '87 edition of the "Drive Other Car Coverage" endorsement (form CA 9910) applies to Mr. Heffernan and that Mr. McMahon would be an under-insured driver rather than an uninsured one, is whether underinsured motorist coverage is included in the terms of this edition of the endorsement. There is no separate box for it, as there is on the '93 and '97 editions of the endorsement, but underneath the schedule a note provides that "[w]hen uninsured motorists [coverage] is provided at limits higher than the basic limits required by a financial responsibility law, underinsured motorists is included, unless otherwise indicated." Nothing is written in the schedule for the limit on uninsured motorist coverage, and when "no entry appears above [in the schedule], information required to complete this endorsement will be shown in the Declaration as applicable to this endorsement." Turning back to the Declarations section (CA 7200), there is no number listed in the "Limit" boxes in the uninsured and underinsured motorist sections; instead the reader is directed to "See Endt. [endorsement] #3" (CA 7999, 08/87 edition).[13] This endorsement provides as follows:

---

[13] Note that there is a potential conflict between Endorsement 3 and another endorsement entitled "Uninsured and Underinsured Motorists Coverage Endorsement" (AK 1430-1, 12/92 edition) which provides that "the insured has elected to reject Uninsured and/or Underinsured Motorists coverage" in all states where UIM is not mandatory, and for those states in which UIM is mandatory, "the lowest permissible coverage limit applies". As this other endorsement is in the packet relating to "Virginia Declarations" (policy no. F5D 008 449-00), however, rather than the main packet (policy no. F5D 008 448-00), and is not referenced in the Declarations section of the main packet, it seems unlikely to apply.

11

> For all states, where permitted to do so, the Insured [the corporation] has selected Uninsured and/or Underinsured Motorists coverage at the limit shown on the Declarations. In those states where this limit is higher than permitted, the maximum available limit applies. In those states where this limit is lower than permitted, the lowest permissible limit applies.

It thus remains unclear what amount of uninsured[14] motorist coverage is afforded under the Declarations section, as Endorsement 3 discusses the interaction between the Declarations section and any applicable statutory provisions. Endorsement 3 does not supply the figure missing from the Declarations section.[15] This missing figure must be established in order to determine whether underinsured motorist coverage is provided under the terms of the '87 edition of the "Drive Other Car Coverage" (form CA 9910). If the figure is higher than that required by the law of whichever state Mr. Heffernan is determined to be associated with, then underinsured motorist coverage seems to be provided in addition to uninsured motorist coverage; if the figure is lower than that required by the law of the relevant state, then underinsured motorist coverage seems not to be included.

Lumbermens asks the court to reject the plaintiffs' motion for discovery relating to the ambiguities of the three "Drive Other Car Coverage" endorsements "because the endorsements do not apply." (Opp'n Mot. Extend 7-8.) Given the lack of clarity created by the three

---

[14] The limit of underinsured motorist coverage set forth in the Declarations (CA 7200) does not appear to be relevant to the case, as the question is whether the uninsured motorist coverage provided for in the '87 edition of the "Drive Other Cars Coverage" is large enough so that underinsured motorist coverage is included, not whether the underinsured motorist coverage set forth in the Declarations section applies.

[15] Erie seems to have assumed that the limit set forth in the liability part of the Declarations section (form CA 7200)– one million dollars– also applies to the uninsured motorist coverage. (*See* Mem. P. & A. Supp. Mot. Intervene or Mot. Consolidate at 4-5) (referring to the one million dollar limit of underinsured motorist coverage in the Lumbermens' policy).

endorsements, and the importance of the issue, the plaintiffs will be permitted to conduct limited discovery as requested in their affidavit.

A separate order follows.

February 21, 2007                                 /s/
Date                                              Catherine C. Blake
                                                  United States District Judge

13